Have it gotten hot in Northwest Arkansas yet? Uh, it's not been too bad. It's been raining a lot, which is unusual for Arkansas, but it's not been too bad. Not all bad. All right. May it please the court, my name is Lucian Gillam. I'm here representing the plaintiff in this case, David Harrell. The only claims that are remaining are those that were dismissed on summary judgment that were in the form of a retaliatory reference, a retaliatory discharge, and a retaliatory attempt to decertify him as a law officer. Everything else is either not appealed or disposed of at trial after the summary judgment had been granted. The first thing I was going to talk about... You have not appealed the jury verdict? No, sir. No, sir. It was a straight up trial. There was nothing to appeal. In any event, just speaking about the issue of the retaliatory reference first, there's a few different things that the defendant attempted to argue. One is that they seemed to argue that there was no adverse action, claiming that we could not show that my client was actually denied a job based on a negative reference. There's two problems with that. First is that you're not required to show that. Second is that if you were required to show that, we did. The reason I say that you're not required to show that is... Show what? That he didn't get the job? Yeah, that he didn't get the show causation between the negative reference and not getting the job. The reason I say that you're not required to show that is that, first of all, there's a case from the Eighth Circuit called Smith v. St. Louis University. Later on in the opinion, it indicates that... describes what you have to show to establish a retaliatory reference claim. And it says that if Schweiss provided negative references to Smith's potential employers as... and she demonstrated that he did so because she complained about his harassment, then a jury can find that there was discrimination. I mean, they describe what you have to prove as part of their holding, and proving causation is just not part of it. One thing that has been said in these cases is that failure to give a reference is one of the more... between the action taken and the protected activity. Yes, sir. I agree with that. You have to show causation between the protected activity and the negative action. In other words, retaliatory intent is basically what that means. You just don't have to show causation between the lost job and the reference. Well, and that the intent was based on the protected activity, and given the time lag here, that's problem-free. At least an issue. That's what they're arguing, but that would be true if we were going via more of a circumstantial evidence, McDonald-Douglas case, where time is more of an issue. Well, we have so many supervening events between his complaining about the initial actions taken after his traffic accidents and his ultimate termination. Well, that's true. Which then led to things going in his file that were viewed by prospective other employers. That's a big chain of events to find a call. You've got to prove that the evil intent, so to speak, survived everything that happened. And caused the final action. Okay, and we can do that. And the reason I say we can do that is, first of all, if you look at the— Well, how can you show that the things that went in the Jefferson County file after he was terminated, what's the evidence that those were unusual? That those wouldn't go in the file of every ex-employee? Well, the first thing is that mere disclosure of an EEOC charge in the file, I mean, it's not supposed to be in there. It's the EEOC versus—no, it's Rudlinger, where disclosure that there was an EEOC activity was considered to be— Is that 8th Circuit? No, it's not 8th Circuit. I think it's 3rd Circuit. But in any event, disclosure of that was considered to be inappropriate. So it's not supposed to be in the file. If you look at the EEOC compliance manual, they indicate that where somebody disclosed that she had a lawsuit or that she filed an EEOC charge and she's troubled, that that is— They don't have to file a Rudlinger if they're choosing not to. It may be a risk, but so what? Well, part of what's unusual is that they said, Chief James said that false things should not be in a personnel file. And right in there with the EEOC charge, there was—let's see. There was only a portion of the allegations that they brought to ELITA in their attempt to decertify. And it was the portions that had been false. If you looked at what was in there, you'd think that the ELITA proceeding was still going on, when in reality, at that point, my client had been cleared by unanimous vote and Chief James and Sheriff Robinson had been directly accused by one of the commissioners of lying to them. If you look at the documents that they sent along with that EEOC charge, they indicate that he let girls who were drinking go and just drive off where they'd be a danger to the community. Yet in their investigation, they found that was not sustained. They indicated that Harold was drinking himself in those documents. That also was not sustained, and he denied it. They indicated that he was uncooperative due to failing to go to a polygraph and that he had lied about the reason, falsely claiming that he was about to have a baby. When in reality, he was about to have a baby, and not only was he about to have a baby, sir, his wife and his baby were close to death. She had lost a bunch of blood. The baby was coming months early. They indicated that he was neglecting his duties, but if you look at pages 954, 953. But that's all in the things that were tried to the jury. I'll bet if I read the transcript of the trial, all those things were in there. Well, those things were in there, but they were in there as directed towards an FMLA and a race discrimination claim. The retaliation claim was not tried to a jury. It was a summary judgment. I understand that, but I don't. Well, okay, let me make sure I understand the theory here. Yes, sir. He gets fired. You file an EEOC complaint, so that's the protected action. That's the main one anyway, right? Yes, and then he files suit. Then he files suit. So that's the protected action. And the negative reference is turning over the file with the EEOC complaint and the evidence that you claim is false. How do you make the link between the EEOC complaint and lawsuit to the negative reference, which was, I think, 18 months or two years later? Well, first of all, we can establish it two different ways. One is that the EEOC has indicated that providing negative information and disclosing the protected activity is direct evidence of retaliatory intent by the person giving the reference. Now, is there an Eighth Circuit case that says that? No, there's not an Eighth Circuit case. Is there a case from any other circuit that says giving a negative reference following protected activity is direct evidence of retaliatory intent? I thought all the EEOC said is that it can be an adverse action. No, the EEOC, if you look at my brief, sir, there's a large block quotation from the compliance manual that indicates that that is direct evidence. Now, going to your question, I think the mere giving of a negative reference would be a harder case for a plaintiff if it was only just like she wasn't a good employee. But that's not what happened here. What happened here is that they disclosed his EEOC charge in combination with a bunch of evidence that they knew to be false at the time, that Chief James admitted, appendix pages 950 through 954, that he knew to be false, that he knew that my client had not neglected duty, had not been dishonest, had not failed to cooperate, none of that. And if you're looking for a case like that, the Duke case that was cited in my reply, J-U-T-E, I think that's the Second Circuit case, it's not Eighth Circuit, but it is the Court of Appeals, indicated that basically where you had a negative reference combined with disclosure of the protected activity, which was that the individual was suing, although at that point she had only filed an EEOC charge, I believe, that that was sufficient to evidence retaliatory intent. Can I ask? Yes, sir. I want to clarify one other thing here. You said you don't have to show cause and effect between the negative reference and not getting the job. Yes, sir. But as I understand your allegation is that your client was ranked number one on the Hot Springs employment list. He doesn't get the job. He calls them and asks why. Did they say it's because of this reference? How did he find out about the negative reference? He found out about the negative reference because after the fact, after he wasn't told anything for months on end, he FOI'd his file, and what he got from the Hot Springs Police Department was 60, 70 pages, and included in it was about 15 pages, which are in the appendix, from the Jefferson County Sheriff's Office, which the testimony was that it came directly from Lafayette Woods and that Chief James was responsible for giving references at the Jefferson County Sheriff's Office. And basically how we know he would have got the job is that Hot Springs, the evidence was that if you're number one, we background you. If you pass it, you succeed. If you don't pass it, you fail. And the testimony was that from Corporal Means, who did the reference check and who spoke with the chief about it, was that the information from Jefferson County was the cause of my client not being hired. Was that the chief, Means? No, he was the corporal, but he had had discussions. But the chief said the EEOC charge had no impact. Chief, that's what the chief said. Who made the decision? The corporal or the chief? I think that they did it in concert would be the evidence. They had discussions about it. But in any event, the corporal, if you look at his summary, and there's his summary, it's a little short, barely two pages. There's nothing negative in it except one thing, which is Jefferson County. And the reality is that if my client was not hired by Hot Springs because of the EEOC charge, that's one possible reason. The other would be all the other false stuff that came from Jefferson County along with that EEOC charge. The EEOC charge is important because it proves retaliatory intent. I don't understand what this false stuff. I thought there was just a transcript of what Jefferson County presented to the Law Enforcement Commission. Yes, but Chief James said that false information should not be in that file, and nearly everything they said in there about my client and his conduct, lying, being uncooperative, was later on proven to be false. Chief James admitted that it was false. But why? All right, so it was incomplete. Well, it was false. It was a lie, sir. Is it okay just to lie about people? I don't think so, especially not when you're doing it because they filed an EEOC charge. I mean, if you look at the evidence in there, almost everything they said about my client was proven to be false. Proven how? Proven through their own testimony. Proven because they were at Alita. You mean in this lawsuit? In this lawsuit, but also by that time they had been to Alita, they had been to the Law Enforcement Commission, which is if ever there was a jury of peers for high-level officers, that's it. It ruled not to decertify. Right. And apparently one commissioner wrote an opinion saying that the presentation was garbage from Jefferson County. Chief Walraven accused Stanley James directly of lying to him. Okay, what's the appendix cite for that? That would be ‑‑ I think it's around page ‑‑ I thought that was what James was saying. Well, that's where in dealing with ‑‑ It's appendix pages 950 through 954. Is that James testifying? Yeah, that's James testifying. No, no, I want a documentary reference to the Alita chair. Well, he's being questioned by Walraven during that. That's who was questioning Chief James. Is this a transcript from the decertification? Yes, sir. Yes, sir, it is. So, okay. Anyway, I'm running out of time. Mr. Newell, may it please the court, if I could start with where Mr. Gillen left off to perhaps clear some of that up. At the decertification hearing, first of all, the pages that were in the Hot Springs Police Department file were about 14 pages that were a transcript from a December initial appearance where the Jefferson County Sheriff's Department representative showed up. The case was called on the docket, if you will, and Lafayette Wood stood before the commissioners and basically presented what the case would be. And he claimed that Mr. Harrell lied about his wife being in the hospital? No, he did not, Judge Boyd. He never said that he lied about that? He said that they had rescheduled the polygraph twice. He also said that we were going to have to do it again. So if I check the record, you're willing to stand that he never said that Harrell lied about his wife being in the hospital? I don't believe he did. Now, there's one statement I have in your brief that I really have some problem with. You said there's no evidence that Jefferson County suggested that Harrell was unfit to be an officer. He did not. Well, they tried to decertify him. They did, but that was in connection with the job reference. They never talked to him. So if somebody asked me for a job reference and I said he is not fit to be certified as an officer, that doesn't mean he's unfit to be an employee? If those comments were made, I would agree with you. Well, isn't that what a decertification is? You tell me what a decertification is. If it's anything other than you're not fit to be an officer. They clearly tried to get him decertified. So what does that mean? It means that they found his conduct so unfit. So he wasn't fit to be an officer. They terminated him. So they said he wasn't fit to be an officer. That's right. And you said here that they never said that. No, I believe I said that. I don't believe that he said that Mr. Harrell lied about his wife. No, you say in your brief that they never suggested he was unfit to be a police officer. Correct. And the word suggested. I thought you just said they did say he was unfit to be a police officer. They didn't say that. They terminated him, which, of course, if an employee gets terminated, especially in law enforcement, someone else may imply that he's not fit to be an officer. I mean, how can you? Okay, I don't want to beat a dead horse. But if you terminate an employee and ask if he's decertified as a police officer, how can anybody say that that isn't a suggestion that he's unfit to be a police officer? They probably couldn't. So when you say they never made that suggestion, that wouldn't be correct. I meant it literally, Judge. I meant that on the phone call between the Hot Springs Police Department and the Jefferson County Police Department, the Hot Springs guy, the Jefferson County guy, never said David Harrell is unfit to be a police officer. He answered when asked. He said, I can send you some things that the Hot Springs police officer asked for. Interestingly on that, though, in the record at page 218, Courtney Kaiser was one of the Hot Springs police officers. She testified. She actually found that material by Googling David Harrell. That's going to be at page 280. Wait a minute. That means it was in the Jefferson County file, right? It was. It was. I'm not denying that. So an incomplete transcript of the Alita proceedings was put in the Jefferson County file. It was.  I don't deny that, Judge. All I'm saying is that. You heard how I ended. You answered before I ended. I'm sorry. That, by what they put in the file, told every other police force and law enforcement force or jurisdiction in the state that he wasn't fit in Jefferson County's view to be hired. But I think the important thing about that is the issue in this case is retaliatory intent. That's where we are. No, but we're not. That's not what we're talking about right now. Now, who testified as to why such an incomplete portion of the Alita proceedings found its way into the file where other prospective employers could look at it? Nobody did. There's no testimony. And so you. It's fairly obvious that the defense should have put something on to that effect. Explaining why just the introduction to it by the presentation that would be made that failed in the desert counties during certification, why that was the only thing that went into the file. Courtney Kaiser testified. The only testimony in the record is Courtney Kaiser's deposition, which she said she found it on her own. And the notes are in there, and she talked. Well, where did she get it? She Googled it. But what did she Google? Did she know it was the Jefferson County file? She got it. It's public information. It didn't support your summary judgment motion. It's public information, Judge Long. It is? The ACLES transcript was public information that she found by Googling David Harrell. That's what she testified. So they didn't put it in the file? I think they did. I think they did. I'm not denying they did. So Jefferson County did send it? I believe they did. All I'm saying is incidentally. So why did they send the EEOC complaint? I believe, first of all, there's nothing in the record that explains that, except for the testimony of McCrary Means where he says he called Major Woods and asked for it. That's what he said. Who's Means? He's the corporal that was assisting Chief Florey in making the hiring decision in Hot Springs. So how did he find out there was an EEOC complaint? Had the lawsuit been filed at that point? The second lawsuit. We were on the second lawsuit by then. There had been two lawsuits filed, the first one in 2010 and the second one in 2011, both against the same defendants, only they added Hot Springs as a defendant after Hot Springs didn't give him the job. They had already, the EEOC form 5 was filed in February of 2010. The job interview was presumably in late 2011. I think that my view of Mr. Let me ask you this. Okay. You got protected activity. You're filing the EEOC complaint. You agree on that, right? Yes. And the lawsuit. Let's say, although you don't agree with this, let's say that giving the partial transcript and the EEOC complaint to Hot Springs at least creates a jury issue as to whether that's a negative reference. All right? You may not agree with the following. Let's assume there's a negative reference and an EEOC complaint separated by roughly 15 to 18 months. Is that not direct evidence of retaliatory intent? No. Explain why. I believe it's direct evidence of tension between former employees and employers. I do not believe there's any evidence that it's evidence of improper retaliatory intent under Title VII. And finally, and perhaps more importantly, it's clear from the record that there's no causation. As Judge Logan was quoting Mr. Gillen a while ago, Chief Lorry testified in an affidavit that the form five had absolutely nothing to do with his decision. And so I think even if it – That's not causal connection. That's causation. And I don't know that Burlington Northern v. White requires causation. Only causal connection. Because we're looking at Gillen. But the problem is, ultimately, the problem is that what Mr. Harrell's argument does is it completely whitewashes two years of really bad, really bad conduct that's in the record about David Harrell, about the wrecks, about being deceitful in the internal affairs investigations, about the girls in the ditch incident on a Saturday night when he goes out to help two girls at 10.30 at night in his street clothes. But he drives a police car and he turns the blue light on and he doesn't call it in. And his corporal smelled alcohol. I mean, he doesn't take any of that into account. And also doesn't take into account it's clear from the record that David Harrell applied for 21 different positions. And none of the others, was there any evidence of a negative reference? I mean, if my clients are out to get him, wouldn't they be given a negative reference every time they got a chance? They didn't. All they did is tell the people that I can't tell you about David Harrell. David Harrell has signed a release, however, and if you want to come see his file, you may. What about the argument that they gave false testimony to the decertification board? If there's enough evidence to at least get that to the jury, does that qualify as ñ why would that not qualify? I think it would. But there's absolutely no proof of that. I mean, I vehemently deny that those pages that ended up in the hands of the Hot Springs Police Department were false. There's nothing in there that's false. What it is ñ Is there anything in the whole transcript that's false? Because you just said the whole transcript is a matter of public record. I'm talking about the December appearance before ACLU. Well, I'm talking about the transcript. You just said that you can Google the transcript. So if I Google that transcript, will I find false testimony in there? I don't believe you will. I do believe you will find, as in any lawsuit that we've all been involved in our whole lives, two sides to a story. For instance, Corporal Harper said, I smelled alcohol on David Harrell's breath. I'm talking about things that are more objective. Your opponent says, and I'll look it up, but he says that your police chief testified that Harrell lied when he said he didn't show up for the polygraph because he lied when he said he didn't show up because his wife was in critical condition in the hospital about to give birth to a high-risk birth or a baby. He said he lied about that. Now, that's an objective fact. And if he were here, he would say, Judge Malloy, the reason I said that was because— So you did say that. The reason I said that is because Andy Hoops, who is a sergeant, told me that David Harrell told his daughter that the real reason he didn't go was because he just didn't want to. Now, whether that triple hearsay is true or not is beside the point. To a police—my police chief would tell you that's why I said that. So, again, I think that doesn't mean he's lying. It means that he is relying on—perhaps he's relying on bad facts, triple hearsay. I don't know. These police officers don't observe rules of evidence when they make day-to-day decisions. They just go by what they hear, and they try to make the best decisions that they can. And I think that's what the Jefferson County defendants did here. They had a, quote, bad cop, at least in their mind. He may be a great guy now. I hope he is. But back then, he was having a couple of bad years. And he wrecked three—he totaled three cars. I admit two of them weren't his fault, but speed was involved. And the sheriff had been advised by the Whitehall Police Department earlier in the year that, hey, you've got—David Harrell's been driving too fast out here. I mean, he had been—the sheriff would tell you, Judge Malloy, that I told David Harrell to slow down and not do that. Now, David Harrell has put in his affidavit. He didn't tell me that. Well, somebody's lying or mistaken or doesn't remember well, but that doesn't mean that we lied. It just means that we presented our version. It's like an opening statement. Lafayette Woods made an opening statement to ACLEST. He said, here's what we're going to prove. They come back seven months later, and lo and behold, as the panel held, they didn't prove it. The panel did not decertify David Harrell. But that's a very high standard. They're not looking for beyond a preponderance of the evidence at those things. You've got to do some pretty bad stuff to be decertified as a law enforcement officer. And that's what happened. It wasn't a court. I mean, I would like to think if it had been a court with a preponderance of the evidence standard, he would have been decertified, but I don't know that. All I'm just saying is it was my story versus your story. So I do deny that there's any false statements made by Jefferson County defendants in the record. I concede that Mr. Harrell says we were lying, or he uses the word false throughout his brief. But he can loosely throw that phrase around. But I don't believe it to be accurate, and I don't believe it to be supported by the record. Thank you very much. I appreciate the time. Very good. Mr. Gilliland? He doesn't, Your Honor. Very good. The case has been thoroughly briefed and argued, and we'll take it under fire. Okay. I don't know how I couldn't read it, but it's appendix page 953. You say 63? 953. And Walray was doing the question down at line 14 through 15. We'll check it out. Okay, I'm sorry. I apologize. Thank you for your time.